1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

LAUREL P. COLESTOCK,

CASE NO. 2:22-cv-00329-LK

Plaintiff,

12

v.

13

DOUGLAS A. TULINO,

14

Defendant.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT

15

16        Plaintiff Laurel Colestock brings this Title VII action against her former employer, the

17   United States Postal Service.[1] The matter comes before the Court on the parties' cross motions for

18   summary judgment. Dkt. Nos. 54, 86. For the reasons discussed below, the Court grants USPS's

19   motion for summary judgment and denies Colestock's cross-motion for summary judgment.[2]

20

21

22   _____

[1] Douglas A. Tulino is properly named as the defendant in this case as the acting Postmaster General of USPS. 42
23   U.S.C. § 2000e-16(c); *see* Dkt. No. 1 at 1 (naming Louis DeJoy, who has been automatically substituted by Douglas
     A. Tulino); Fed. R. Civ. P. 25(d). However, for ease of reference, the Court refers to USPS as the defendant.

24   [2] Because the Court can decide the parties' motions based on their written submissions, it declines Colestock's request
     for oral argument. Dkt. No. 86 at 1.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT - 1

# I.    BACKGROUND

The following background is relevant to the pending motions.

## A.    Factual Background

### 1.    USPS Hires Colestock at the Eastsound Post Office

Colestock began working for USPS in 2014. Dkt. No. 55-12 at 2; Dkt. No. 89 at 1. During her tenure at USPS, she primarily worked at the Eastsound Post Office on Orcas Island, Washington. Dkt. No. 55-12 at 3; Dkt. No. 87-13 at 11. In July 2015, Colestock became a part time flexible clerk, and in that role, would occasionally fill in as officer-in-charge ("OIC") in the postmaster's absence. Dkt. No. 55-18 at 6; Dkt. No. 87-1 at 3. Under USPS policy, "[w]hen a career employee is temporarily absent, his or her position may be filled by temporary assignment, reassignment, or promotion," Dkt. No. 55-1 at 3, resulting in a higher level of pay for the employee filling in, *see* Dkt. No. 87-4 at 3. USPS employees sometimes refer to this elevated pay rate, i.e., when a supervisor authorizes a subordinate to be paid at a postmaster's level, as "1723." Dkt. No. 89 at 2; *see also* Dkt. No. 55-18 at 21.[3] For several months in 2019, Colestock served as OIC on an interim basis while USPS was between postmasters at Eastsound. Dkt. No. 55-3 at 28.

In February 2018, Colestock filed an Equal Employment Opportunity ("EEO") complaint alleging that between early 2016 and early 2018, one of her colleagues created a hostile work environment for her and that the then-postmaster violated her privacy rights by divulging Colestock's medical information to other employees. Dkt. No. 55-15 at 2–12; *see also* Dkt. No. 55-16 at 10. Colestock's 2018 EEO complaint resulted in a settlement. Dkt. No. 55-18 at 7.

---

[3] USPS uses a timekeeping system called the Time and Attendance Control System ("TACS"), which tracks the rate at which employees are paid for their time on the clock. Dkt. No. 87-3 at 14; Dkt. No. 87-4 at 3; Dkt. No. 55-20 at 7.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT - 2

1      2.      USPS Hires Bruce Cowen as Postmaster at Eastsound

2          In November 2019, USPS hired Bruce Cowen as the postmaster at Eastsound. Dkt. No. 55-

3  19 at 6; Dkt. No. 87-3 at 7. Cowen had been employed with USPS since 2005, and prior to

4  becoming Eastsound's postmaster he worked as manager of distribution operations in Medford,

5  Oregon. Dkt. No. 55-3 at 5; Dkt. No. 55-19 at 4, 6. Cowen became Colestock's direct supervisor.

6  Dkt. No. 87-3 at 7; *see also* Dkt. No. 55-21 at 6. However, Colestock continued performing many

7  of the postmaster's duties and also served as Cowen's trainer. Dkt. No. 55-18 at 40; Dkt. No. 55-

8  3 at 21, 37; Dkt. No. 87-3 at 8; Dkt. No. 93-2 at 3.

9      3.      Colestock and Cowen Begin a Sexual Relationship

10         In February 2020, while Colestock was on vacation, she and Cowen began exchanging

11  increasingly "bold" text messages. Dkt. No. 93-3 at 2–4; *see* Dkt. No. 55-3 at 22, 29; Dkt. No. 55-

12  9 at 10; Dkt. No. 55-14 at 3; Dkt. No. 91-1 at 6–83. When Colestock returned from vacation that

13  month, the relationship turned physical. Dkt. No. 55-3 at 22–23, 29; Dkt. No. 55-14 at 3; Dkt. No.

14  87-1 at 8–9; Dkt. No. 93-2 at 5; Dkt. No. 93-3 at 4–5. According to both Cowen and Colestock,

15  the two thereafter engaged in sexual acts frequently—sometimes while drinking alcohol during

16  work hours at the Eastsound Post Office—until she left for an assignment at another post office in

17  December 2020. Dkt. No. 55-3 at 29, 37–38; Dkt. No. 55-9 at 10; Dkt. No. 87-1 at 11. For the next

18  several months, Cowen and Colestock also exchanged intimate text messages. *See, e.g.*, Dkt. No.

19  55-2 at 6, 9, 12, 15, 17, 26–27, 34–36, 44, 48, 54–56, 74, 254–55; Dkt. No. 55-3 at 22; Dkt. No.

20  91-1 at 91–105; Dkt. No. 93-1 at 1–4. Although their text messages during this period were not all

21  amiable, *see, e.g.*, Dkt. No. 55-2 at 143–45, Colestock described the dynamic, at least initially, as

22  consensual, *see* Dkt. No. 55-3 at 22, 29, 33; *see also* Dkt. No. 91-1 at 88, 103–04. She later stated

23  that she "did not turn down his advances and continued the relationship" because she thought doing

24  so would prevent her coworkers from harassing her and could benefit her career. Dkt. No. 55-3 at

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT - 3

31; *see also id.* at 23; Dkt. No. 87-1 at 12–13; Dkt. No. 91-1 at 77–79. Colestock testified at deposition that she was scared of Cowen during their first physical interaction, Dkt. No. 87-1 at 9–10, and separately maintained in interviews and written statements that she felt like she did not have a choice other than to continue engaging in sexual conduct, and that Cowen "made it clear that he held [her] future," Dkt. No. 55-12 at 4–5; *see also* Dkt. No. 55-14 at 3.[4]

During this period, Colestock consistently received higher level postmaster pay, even when she performed postmaster duties for only part of the workday and despite Cowen also being paid to perform the duties of postmaster. Dkt. No. 55-3 at 7, 21, 27, 37; Dkt. No. 55-12 at 5; Dkt. No. 55-18 at 19; Dkt. No. 87-3 at 14; *see* Dkt. No. 55-2 at 123 (Cowen's August 11, 2020 text to Colestock stating that her "1723 is through Jan 1"). At deposition, Colestock estimated that she received higher level pay "[a]lmost consecutively" from approximately the end of February 2020 until she left Eastsound in December 2020. Dkt. No. 55-18 at 19–20. Colestock would later tell investigators that she did not think she was paid at that level in return for her sexual acts, but that Cowen "mentioned he would cut her hours or higher level pay when he was upset with her." Dkt. No. 55-3 at 22–23; Dkt. No. 55-20 at 5. She also testified at deposition that Cowen threatened to reduce her hours and rate of pay on multiple occasions when she expressed her desire to stop engaging sexually with him, Dkt. No. 55-18 at 16–17, and that he briefly removed her from the higher level pay in July 2020 when she said she "didn't want to do anything extra for him anymore sexually," *id.* at 25; *see also* Dkt. No. 87-1 at 14–16, 18.[5]

---

[4] On the day of their first physical interaction, Colestock sent a text message to Cowen asking, "Are you going to touch me someday or is that breaking the rules?" Dkt. No. 91-1 at 88.

[5] During the earlier Office of Inspector General investigation, Colestock said that Cowen threatened to take her off higher-level pay in July 2020 because she refused to perform administrative duties. She specifically recounted that she was frustrated because Cowen left the office midday, so at 4 p.m., she clocked out and left. Dkt. No. 55-3 at 27. She messaged Cowen to say he could take care of the closing reports on his own, and he responded with, among other things, "I will not extend your 1723 [higher-level pay] if you are not willing to help with office stuff." *Id.* Colestock resumed helping with Postmaster duties, and by August 11, Cowen told her he had approved her higher-level pay through January 1, 2021. *Id.*; *see also* Dkt. No. 55-2 at 117–20, 123.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT - 4

4.      Colestock Accepts a Temporary Position at the Snohomish Post Office

In December 2020, Colestock volunteered for a detail opportunity to serve as an acting supervisor at the Snohomish Post Office. Dkt. No. 55-18 at 6, 9. She avers that she did so because she "wanted out of Eastsound and away from Bruce Cowen." *Id.* at 10; *see also* Dkt. No. 55-3 at 31. The record reflects that Cowen and Colestock continued exchanging explicit messages, including nude photos, after she accepted the role in Snohomish. *See* Dkt. No. 55-2 at 182, 186, 190–91, 194, 202, 215–16, 219, 228–29, 230–33, 236, 241–44, 252, 311–18; *see also* Dkt. No. 55-3 at 29–31; Dkt. No. 55-18 at 21–22; Dkt. No. 89 at 2. She also continued performing administrative duties remotely for Cowen and the Eastsound office while on detail, including timekeeping. *See, e.g.*, Dkt. No. 55-2 at 207, 227, 240–41. On May 10, 2021, Colestock texted Cowen regarding "what it would look like to transition back to the island." *Id.* at 310–11. On May 14, 2021, she asked: "If I come back at the beginning of June, will I be in higher level or just a clerk?" *Id.* at 311. Cowen responded: "Back to your bid job," which meant she would not resume being paid at the higher level. *Id.*; *see* Dkt. No. 55-3 at 19.

Colestock remained detailed to Snohomish from December 2020 until her eventual termination in August 2021. Dkt. No. 55-18 at 10. She stated that although she and Cowen did not have any in-person sexual encounters after she left Eastsound, the two exchanged photos up until May 7, 2021, and last communicated on June 7, 2021. Dkt. No. 55-3 at 29; Dkt. No. 55-18 at 16, 23–24; *see also id.* at 39; Dkt. No. 55-8 at 5–6; Dkt. No. 55-9 at 10.

5.      Colestock Reports Cowen's Conduct to a Colleague and an Investigation Ensues

On May 19, 2021, five days after Cowen told Colestock that she would not be paid at the higher level if she returned to Eastsound, Colestock called Eden Ching, a longtime USPS employee and the postmaster in Custer, Washington, who had been on retention detail in Snohomish. Dkt. No. 55-3 at 16, 18; Dkt. No. 55-23 at 5; *see also* Dkt. No. 55-14 at 3. Colestock told Ching that

Cowen improperly charged $3,000 on Colestock's USPS credit card, which she left in a desk

drawer in the Eastsound Post Office. Dkt. No. 55-3 at 16–18, 28; Dkt. No. 55-12 at 7. During their

conversation, Colestock also revealed the sexual nature of her relationship with Cowen, that he

had paid her at a higher level to do postmaster duties, and that Cowen said she would not be paid

at a higher level if she returned to Eastsound. Dkt. No. 55-3 at 17–19. Ching told Colestock that

she would not report this information, but encouraged Colestock to do so on her own behalf. *Id.*

Ultimately, Ching reported what Colestock shared with her because she felt that if she did not, she

would be "guilty for allowing it to continue." *Id.* at 19; *see also* Dkt. No. 55-18 at 18.

Based on information provided by Ching, USPS's independent oversight agency, the

Office of Inspector General ("OIG"), launched an investigation into Cowen's alleged inappropriate

conduct. Dkt. No. 55-3 at 5; *see id.* at 6, 16; Dkt. No. 55-9 at 5; 5 U.S.C. § 415(f)(3)(B)(i). The

investigation spanned from May 24, 2021 to June 30, 2021. Dkt. No. 55-3 at 3. OIG agents Alan

Hancock and Julie Wold interviewed Colestock at the Snohomish Post Office on May 25, 2021.

*Id.* at 20. During her interview, Colestock described Cowen's misconduct in greater detail,

including the inappropriate credit card usage and timekeeping, drinking on the job, and

unauthorized driving. *Id.* at 20–22.[6] Colestock also said she and Cowen "had a consensual sexual

relationship, which started in February of 2020[.]" Dkt. No. 55-3 at 8.

The OIG report states that Colestock "said her life at the post office was better if Cowen

was in a good mood and if they got along." *Id.* at 9; *see id.* at 23 ("She said Cowen 'protected' her

at times from the other employees at the post office and sometimes 'hung her out to dry' if they

---

[6] The OIG investigation revealed that Cowen had been driving regularly, including to deliver mail, even though he did not have a driver's license. Dkt. No. 55-3 at 14–15; Dkt. No. 55-5 at 2; Dkt. No. 55-19 at 5; Dkt. No. 87-3 at 10–11; Dkt. No. 87-6 at 7. In fact, Wold had previously investigated Cowen for driving USPS vehicles without a license in 2010, and found that Cowen had been arrested for driving under the influence on five occasions since between 1992 and 2010. Dkt. No. 55-3 at 14; Dkt. No. 87-13 at 13–14. Following the 2010 OIG investigation, Cowen was issued a "Letter of Warning in Lieu of 14 Day Suspension." Dkt. No. 55-3 at 14; *see* Dkt. No. 55-4 at 2.

1    were not getting along."); *id.* ("Colestock said as long as she went along with the sexual

2    encounters, party atmosphere, and completing the Postmaster duties, then Cowen would stop the

3    harassment by other employees and he would be nice to her as well."). Colestock further mentioned

4    an occasion where she "tried to break off the relationship with Cowen and he became very upset

5    and was shouting profanities[.]" *Id.* Although Colestock conceded she did not uphold USPS's

6    ethical standards, she "said she had dealt with years of documented harassment at the Eastsound

7    Post Office and felt as though she had no other option but to continue with the wrongdoing to make

8    her work environment tolerable." *Id.* ("Colestock said initially she had feelings for Cowen but now

9    just wanted to come to work in a safe and harassment free environment."). She also said that

10    "Cowen told her if she came forward with the sexual misconduct it would be worse for her than

11    him, since he was close to retirement," and surmised that Cowen may be having a relationship

12    with another clerk because that employee "was being paid higher level pay and . . . doing the

13    Postmaster duties." *Id.* at 9–10. After the interview, Colestock provided a voluntary sworn

14    statement dated June 11, 2021, which expounded upon the information she shared during her

15    interview. *Id.* at 26–34. Colestock also consented to providing her personal phone to the

16    Snohomish County Sherriff's Office for forensic imaging. *Id.* at 15, 44; *see generally* Dkt. No. 55-

17    2.

18          On June 16, 2021, Hancock and Wold interviewed Cowen at the Eastsound Post Office

19    and he admitted to the substance of most of Colestock's allegations regarding drinking, driving,

20    and their relationship, but denied having a relationship with anyone else in the Eastsound Post

21    Office. Dkt. No. 55-3 at 35–39. Hancock attributed the approximately three-week delay between

22    Colestock's interview and Cowen's interview to the need to review documents and the fact that

23    Cowen had been on leave recovering from hip surgery. Dkt. No. 55-20 at 7. While at the Eastsound

24    office, Hancock and Wold also interviewed another employee who admitted to using Colestock's

credit card to pay utility bills at Cowen's direction, but who denied having a sexual relationship with Cowen, receiving higher pay, and drinking at work. Dkt. No. 55-3 at 41–42.

The final June 30, 2021 OIG report concluded, among other things, that:

> Cowen inappropriately used a government credit card, falsified TACS clock rings, drank alcohol at the post office, and drove USPS vehicles without a valid driver's license. Cowen was also involved in a sexual relationship with a subordinate employee, which included oral sex at the Eastsound Post Office and the use of his postal issued cell phone to send text messages that included nude photos of himself.

*Id.* at 2; *see id.* at 5.

6.    USPS Suspends Cowen and He Retires While Under Investigation

On June 16, 2021—the same day as Cowen's OIG interview—Hancock called Paul Senecal, a labor relations manager at USPS, to inform him of their findings. Dkt. No. 55-20 at 6. The same day, Senecal called Balvinder Singh-Minhas, manager of post office operations, who immediately placed Cowen on off-duty status without pay and scheduled a meeting with Cowen for June 30, 2021 "to discuss the circumstances that led to [his] Emergency Placement in Off-Duty Status[.]" Dkt. No. 55-5 at 2–3; *see* Dkt. No. 55-20 at 6; Dkt. No. 55-22 at 7; Dkt. No. 87-6 at 5. Singh-Minhas and Senecal also discussed firing Cowen. Dkt. No. 55-22 at 6 ("We were ready to send the letter to remove him[.]"). However, before they could meet with Cowen, Cowen reached an agreement through his union representative to "accept retirement in lieu of being further investigated regarding [his] conduct while serving as the Postmaster of the East Sound Post Office," effective June 30, 2021. Dkt. No. 55-6 at 2; *see* Dkt. No. 87-6 at 10–11.

According to USPS, the Office of Personnel Management, and not USPS, makes the determination regarding whether an employee can retire. Dkt. No. 55-19 at 8; Dkt. No. 55-21 at 10; Dkt. No. 55-22 at 5–6. Consequently, Singh-Minhas considered the matter "administratively closed," but cautioned Cowen that if his retirement was not "acted upon or [he] attempt[ed] to return to work," the investigation would immediately continue and further actions, up to and

1    including removal, may be taken against him. Dkt. No. 55-6 at 2; *see also* Dkt. No. 55-21 at 7;

2    Dkt. No. 55-7 at 2 (Cowen's PS Form 50 reflecting that he had retired while under OIG

3    investigation); Dkt. No. 55-11 at 2 (summary of Cowen's reduced annuity benefits). And because

4    Cowen retired under OIG investigation, he became ineligible for rehire with USPS or any other

5    federal agency. Dkt. No. 55-19 at 8–9. Following Cowen's retirement, no one from USPS spoke

6    to Cowen as part of their investigation. Dkt. No. 55-21 at 12; Dkt. No. 55-22 at 4; Dkt. No. 87-6

7    at 11.

8              7.    USPS Investigates Colestock and Terminates Her Employment

9              The OIG sends all Reports of Investigation ("ROIs") to the manager of labor relations. Dkt.

10   No. 55-21 at 4. Accordingly, after the OIG concluded its investigation into Cowen on June 30,

11   2021, it sent the ROI to Senecal. *Id.*; *see also* Dkt. No. 55-19 at 5 (USPS's Rule 30(b)(6) designee

12   stating that the agency learned about Cowen's misconduct from the OIG report). Senecal then

13   decided to begin an investigation on behalf of USPS to validate the ROI. Dkt. No. 55-21 at 5; Dkt.

14   No. 87-6 at 4–5. On August 5, 2021, Senecal interviewed Colestock with her union representative

15   present. Dkt. No. 55-12 at 2–10. During this interview, Colestock conceded that she had engaged

16   in misconduct, but stated she felt like she had "no choice" and that Cowen, her direct supervisor,

17   condoned it all. *Id.* at 4–7. She also stated that she felt she was "being investigated because [she]

18   came forward." *Id.* at 9. During her deposition, Colestock testified that Senecal found it hard to

19   believe that she would maintain her relationship with Cowen for as long as she did if she did not

20   enjoy it. Dkt. No. 87-1 at 6; *see also id.* at 7 (describing Senecal's demeanor during the interview

21   as "[c]ondescending and combative" based on "[t]he questions that he asked, the tone of his voice,

22   [and] the body language"); *see also* Dkt. No. 55-12 at 4–5.

23             Prior to Colestock's interview with Senecal, she alleges that on July 9, 2021, the two spoke

24   by phone "about an unrelated topic," and that Senecal told her she could return to Eastsound as a

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT - 9

clerk but "would never be OIC in Eastsound again," and that "he did not feel [she] should be supervising anyone." Dkt. No. 55-14 at 3; *see also* Dkt. No. 87-1 at 17; Dkt. No. 55-9 at 7.[7] Senecal testified that the two "had a conversation about her supervising" before he interviewed her, and he "told her she couldn't supervise while she's under investigation, and if the outcome of the investigation found her guilty, she could be removed." Dkt. No. 55-21 at 6.

Senecal and his colleague Conner Craig also visited the Eastsound Post Office and conducted interviews with other employees there regarding drinking on the job and knowledge of "any relationship-type issues" involving Cowen. *Id.* at 8–9; Dkt. No. 87-6 at 5.

After reviewing the OIG report and concluding his investigation, Senecal issued Colestock a notice of removal on August 16, 2021, terminating her employment with USPS. *See* Dkt. No. 55-13 at 2–8 (notice of removal).[8] Singh-Minhas served as the concurring official on the notice. *Id.* at 7; *see also* Dkt. No. 87-6 at 3; Dkt. No. 87-8 at 4. The notice informed Colestock that she would be removed from USPS based on unacceptable conduct, including engaging in an "other than professional relationship" with Cowen, drinking alcohol in the post office, and "inappropriately being paid Level 18 Postmaster pay [at] the same time the Postmaster was at work and also in a pay status." Dkt. No. 55-13 at 2; *see id.* at 2–5. Senecal and Singh-Minhas concluded that the text messages between Colestock and Cowen "provide[d] a picture closer to a mutual relationship[.]" *Id.* at 3. Quoting three messages that Colestock sent to Cowen between February 28, 2020 and March 9, 2020, the notice stated that "these messages lead a reasonable person to believe the interactions between [Colestock] and [Cowen] were of a consensual nature." *Id.* Senecal and Singh-Minhas also wrote that Colestock's testimony in her August interview with

---

[7] Other portions of the record suggest this conversation took place on June 7, 2021. Dkt. No. 55-9 at 4, 6–7. However, USPS does not dispute Colestock's representation that it occurred on July 9, 2021.

[8] Senecal testified at deposition that Colestock's union steward was told that Colestock, like Cowen, could resign in lieu of termination. Dkt. No. 55-21 at 11.

Senecal conflicted with her OIG testimony stating that her relationship was consensual. *Id.* at 3–5. Furthermore, in light of the close temporal proximity between Cowen advising Colestock about her reduced pay level if she were to return to Eastsound and her reporting Cowen to Ching, they described Colestock's "motivations for coming forward" as being "of a suspicious nature and appear[ing] to be self-serving at best." *Id.* at 5; *see id.* (stating that Colestock's reporting of Cowen was "appreciated" but did not "exonerate [her] from the egregious violations of USPS policies regarding conduct in the workplace and while on the clock").

      8.    <u>Colestock Contacts the Equal Employment Opportunity Office</u>

On July 27, 2021, Colestock contacted USPS's EEO Office alleging that she was subjected to a hostile work environment, sexual harassment, and disparate treatment. Dkt. No. 55-9 at 2, 4, 6–14. On August 16, 2021, Colestock submitted a formal EEO complaint naming Cowen, Senecal, and Singh-Minhas as respondents, which she supplemented with a retaliation claim on September 4, 2021. Dkt. No. 55-14 at 2–4; Dkt. No. 55-9 at 5, 15–16.[9] In her EEO complaint, Colestock wrote that Senecal's statements to her on July 9, 2021 and her removal were due to her 2018 EEO activity and being female. Dkt. No. 55-9 at 16; Dkt. No. 55-14 at 2–3. Senecal and Singh-Minhas denied knowing about Colestock's 2018 complaint prior to her bringing it up during the investigative interview. Dkt. No. 55-9 at 4–5. Indeed, Singh-Minhas stated that he "did not know who [Colestock] was prior to becoming aware of the issues related to her inappropriate conduct claims." *Id.* at 5.

Colestock also asserted that Singh-Minhas told the Snohomish postmaster about her pending investigation, which "created a hostile work environment," and that Senecal improperly

---

[9] Part of Colestock's claims related to more than $20,000 in expense reimbursements that had not been processed by Singh-Minhas at that time, as well as a request she made for other financial documentation. Dkt. No. 55-9 at 16; *see also* Dkt. No. 55-18 at 29–31. Singh-Minhas eventually approved the reimbursement requests and provided the requested documentation, and attributed the delay, at least in part, to being on vacation. Dkt. No. 55-9 at 5; *see also* Dkt. No. 55-18 at 31–34.

1   copied one of her Snohomish colleagues on an email scheduling her investigative interview. Dkt.

2   No. 55-14 at 3–4. The EEO concluded that that the evidence did not support a finding that

3   Colestock had been subjected to discrimination. Dkt. No. 55-16 at 30. On January 26, 2022, USPS

4   issued Colestock a final agency decision. *See* Dkt. No. 1 at 2; Dkt. No. 11 at 3.

**B.    Procedural Background**

6       Colestock initiated this action in March 2022, seeking damages for USPS's alleged

7   discrimination based on sex, hostile work environment, and retaliation under Title VII of the Civil

8   Rights Act of 1964, 42 U.S.C. § 2000-e, *et seq.* Dkt. No. 1. Specifically, she sets forth four causes

9   of action under Title VII based on her sex and/or gender: (1) disparate treatment, (2) hostile work

10  environment, (3) wrongful termination, and (4) retaliation. *Id.* at 14–20.

11      Following discovery, USPS moved for summary judgment on all of Colestock's claims.

12  Dkt. No. 54. And after an extended briefing schedule and additional discovery, *see* Dkt. Nos. 67–

13  69, 72, 74, 76, 85, Colestock then cross-moved for summary judgment on her hostile work

14  environment claim, Dkt. No. 86.

## II.    DISCUSSION

**A.    Legal Standard**

17      Summary judgment is appropriate only when "the movant shows that there is no genuine

18  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

19  Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

20  stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In essence, the inquiry is

21  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

22  it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

23      When parties file simultaneous cross-motions for summary judgment on the same claim,

24  the Court "must consider the appropriate evidentiary material identified and submitted in support

1  of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous.*

2  *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also*

3  *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court

4  "rule[s] on each party's motion on an individual and separate basis, determining, for each side,

5  whether a judgment may be entered in accordance with the Rule 56 standard." (cleaned up)). The

6  Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences."

7  *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent

8  the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

9  that, where the facts specifically averred by that party contradict facts specifically averred by the

10  movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

11  To establish that a fact cannot be genuinely disputed, the movant can either cite the record

12  or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an

13  adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

14  Once the movant has made such a showing, "the nonmoving party must come forward with specific

15  facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

16  *Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt is insufficient, *id.* at 586,

17  as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to

18  "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must

19  "identify with reasonable particularity the evidence that precludes summary judgment." *Kenan v.*

20  *Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247,

21  251 (7th Cir. 1995)). The Court will enter summary judgment "against a party who fails to make

22  a showing sufficient to establish the existence of an element essential to that party's case, and on

23  which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

24  (1986).

**B.    USPS's Motion to Strike Leatha Declaration and Exhibit**

In its response to Colestock's cross-motion for partial summary judgment, USPS moves to strike the declaration of Brandon Leatha and the attached exhibit containing text messages between two nonparty USPS employees. Dkt. No. 90 at 1–2; *see* Dkt. Nos. 88, 88-1. USPS argues that because Colestock did not produce the exhibit in discovery as required under Rule 26, it should be stricken notwithstanding USPS's position that the evidence is "immaterial." Dkt. No. 90 at 1–2. Colestock contends that USPS's point is "moot" because there is deposition testimony in the record establishing "the same facts" and because Rule 26(a)(1)(A) exempts disclosure of documents to be used "solely for impeachment[.]" Dkt. No. 92 at 13–14. Colestock also asks that, to the extent the Court strikes these materials, it not strike the portions of Leatha's declaration referring to matters unrelated to the disputed text messages.

First, given that Colestock submits the exhibit in support of her motion for summary judgment, *see* Dkt. No. 86 at 22, its use is not "solely for impeachment," Fed. R. Civ. P. 26(a)(1)(A)(ii). Moreover, Colestock does not dispute that she failed to timely produce the exhibit as required under Rule 26(a) and (e), or substantially justify her failure to do so, which constitutes grounds for the Court to strike the exhibit. *See Karpenski v. Am. Gen. Life Companies, LLC*, 999 F. Supp. 2d 1235, 1241 (W.D. Wash. 2014); Fed. R. Civ. P. 37(c)(1).[10] Accordingly, the Court strikes the exhibit to Leatha's declaration, Dkt. No. 88-1, and will disregard any portions of Leatha's declaration regarding these messages in ruling on the pending motions. *See, e.g.*, *HP Tuners, LLC v. Cannata*, No. 3:18-CV-00527-LRH-CSD, 2022 WL 2955111, at *2 (D. Nev. July 26, 2022).

---

[10] The Court also notes that the contested exhibit is not properly redacted. *See* Dkt. No. 88-1 at 3–4.

1    **C.    USPS's Motion for Summary Judgment**

2        USPS moves for summary judgment on all of Colestock's claims. Dkt. No. 54. It argues

3    that her hostile work environment claim is untimely and that the agency took reasonable care to

4    address the alleged harassment. *Id.* at 12–17; *see also* Dkt. No. 11 at 20 (USPS's affirmative

5    defenses). With respect to Colestock's disparate treatment, wrongful termination, and retaliation

6    claims, USPS contends that Colestock fails to raise a genuine dispute of fact that precludes

7    summary judgment. Dkt. No. 54 at 17–26. For the reasons detailed below, the Court agrees and

8    grants summary judgment to USPS on each of Colestock's claims, and therefore denies her cross-

9    motion for summary judgment.

10        1.    <u>Hostile Work Environment</u>

11        Title VII prohibits sex discrimination, including sexual harassment, in employment. 42

12    U.S.C. § 2000e-16(a); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986). To succeed

13    on her hostile work environment claim under Title VII, Colestock is required to establish that:

14    (1) she was subjected to a hostile work environment, and (2) USPS is liable for the harassment that

15    caused the hostile environment to exist. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th

16    Cir. 2021). To meet the first element, she must show that: "(1) [s]he was subjected to verbal or

17    physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was

18    sufficiently severe or pervasive to alter the conditions of employment and create an abusive

19    working environment." *Id.* (citing *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th

20    Cir. 2002)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("When the workplace is

21    permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

22    pervasive to alter the conditions of the victim's employment and create an abusive working

23    environment, Title VII is violated." (cleaned up)). "To determine whether conduct was sufficiently

24    severe or pervasive to violate Title VII," courts examine "all the circumstances, including the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (citation omitted).

Importantly, federal employees must timely exhaust their administrative remedies before filing an employment discrimination suit against their employer. 42 U.S.C. § 2000e–16(c). Thus, "[b]efore a federal civil servant can sue [her] employer for violating Title VII, [s]he must, among other things, 'initiate contact' with an Equal Employment Opportunity counselor at h[er] agency 'within 45 days of the date of the matter alleged to be discriminatory.'" *Green v. Brennan*, 578 U.S. 547, 549–50 (2016) (quoting 29 C.F.R. § 1614.105(a)(1)); *see also Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001); *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1301–02 (N.D. Cal. 2020) (citing *Sommatino v. United States*, 255 F.3d 704, 707–08 (9th Cir. 2001)). The Ninth Circuit has held that the failure to comply with this regulation can be "fatal to a federal employee's discrimination claim." *Lyons v. England*, 307 F.3d 1092, 1105 (9th Cir. 2002).

a.    *Colestock's Hostile Work Environment Claim Based on Cowen's Conduct is Untimely*

As a threshold matter, USPS argues that Colestock's hostile work environment claim is untimely because she had no contact whatsoever with Cowen during the 45 days preceding her initial contact with an EEO counselor on July 27, 2021. Dkt. No. 54 at 13–15; Dkt. No. 90 at 12–15. Colestock does not dispute that she last interacted with Cowen on June 7, 2021, or that she filed her EEO complaint 50 days later, on July 27, 2021. *See* Dkt. No. 55-12 at 4; Dkt. No. 55-18 at 23–24.[11] Rather, she argues that "Senecal perpetuated the hostile environment during the course

---

[11] Furthermore, Colestock does not dispute USPS's contention that her reporting of Cowen's conduct to Ching does not qualify as seeking EEO counseling sufficient to trigger the limitations period. Dkt. No. 54 at 14. Nor does she present any evidence suggesting that Ching was "logically connected" to the EEO process or that Colestock exhibited

of his investigation all of which occurred well-within the forty-five (45) day timeframe preceding EEO contact on July 27, 2021." Dkt. No. 86 at 28; *see also id.* at 16, 23–24, 27, 30, 34, 39; Dkt. No. 92 at 6. To support this argument, Colestock asserts that "Senecal made it known to Colestock's peers that he was coming to her office to interview her, and then he proceeded to subject Colestock to the m[i]sog[y]nistic behavior predicted by Cowen." Dkt. No. 86 at 28; *see also id.* at 29 ("Colestock was again victimized by Senecal, whose response . . . painted Plaintiff as a promiscuous subordinate trying gain an advantage through sex."). Therefore, Colestock claims that she "has gone beyond mere accusations and has shown conduct [by] Cowen and Senecal that created a hostile work environment which extended until the moment she was terminated." *Id.* at 27.[12]

For purposes of timeliness, there is a distinction between discrete employment actions— such as Colestock's removal—and a series of separate harassing acts that collectively form one unlawful employment practice sufficient to sustain a hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002). "[A] hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period," but "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in

---

an intent to begin the EEO process at that time; or that Ching in turn reported the situation to an EEO counselor on her behalf. *See Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1044–45 (9th Cir. 2009).

[12] Although the 45-day regulatory period is subject to waiver, estoppel, and equitable tolling, *Lyons*, 307 F.3d at 1105 n.5, Colestock does not advance any such arguments. In addition, though Colestock alludes in her complaint to the theories of quid pro quo sexual harassment and tangible employment action (and her counsel apparently mentioned them during the course of litigation), *see* Dkt. No. 1 at 15–16; Dkt. No. 55 at 2, she does not expressly advance such a theory as part of her motion for summary judgment or in response to USPS's motion, *see generally* Dkt. Nos. 86, 92. The Court follows the principle of party representation and relies on the parties' framing of the issues. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020); *see also Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 825 F. App'x 440, 442 (9th Cir. 2020). And in any event, as USPS points out, Colestock presents no separate explanation for why her claims based on Cowen's conduct would be timely under these theories. *See* Dkt. No. 54 at 14 n.4; Dkt. No. 90 at 11 n.5.

1  timely filed charges." *Id.* at 113, 122; *accord Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th

2  Cir. 2003). For the former category, it does not matter "that some of the component acts of the

3  hostile work environment fall outside the statutory time period." *Morgan*, 536 U.S. at 117. As long

4  as "an act contributing to the claim occurs within the filing period, the entire time period of the

5  hostile environment may be considered by a court for the purposes of determining liability." *Id.*

6  　　　When determining whether a string of events occurring both before and within the 45-day

7  limitations period constitute a single unlawful employment practice, courts "consider whether they

8  were 'sufficiently severe or pervasive,' and whether the earlier and later events amounted to 'the

9  same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same

10  managers.'" *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) (quoting *Morgan*,

11  536. U.S. at 116, 120); *see also Caldwell v. Boeing Co.*, No. C17-1741-JLR, 2019 WL 1556246,

12  at *11 (W.D. Wash. Apr. 10, 2019). If, however, the timely act "had no relation" to the prior acts,

13  "or for some other reason, such as certain intervening action by the employer, was no longer part

14  of the same hostile environment claim, then the employee cannot recover for the previous acts, at

15  least not by reference to the [latter] act." *Morgan*, 536 U.S. at 122. Here, the Court finds that there

16  is no genuine dispute as to whether Senecal's and Singh-Minhas's conduct within the filing period

17  was of the same type of employment action as Cowen's complained-of conduct before the filing

18  period. Based on the record before the Court, it was not.

19  　　　Colestock describes an extremely serious, months-long pattern of unwanted sexual contact

20  and other inappropriate behavior on the part of Cowen; one that the Court does not take lightly.

21  However, the parties agree that the last sexual encounter between Cowen and Colestock occurred

22  before she decided to transfer to Snohomish, and that their communications ended altogether on

23  June 7, 2021. Thus, any subsequent actions during the limitations period were not perpetrated by

24  the same manager. *Cf. Christian v. Umpqua Bank*, 984 F.3d 801, 810 (9th Cir. 2020); *Medina v.*

1  *Donahoe*, 854 F. Supp. 2d 733, 750 (N.D. Cal. 2012). Further, despite her conclusory assertions

2  to the contrary, Colestock fails to demonstrate how her interactions with Senecal and Singh-

3  Minhas qualify as the "same type of employment actions" as Cowen's unwanted sexual advances

4  and other inappropriate behavior.

5        Senecal interviewed Colestock as part of an investigation into her purported misconduct,

6  and Colestock perceived him to be condescending and combative. Dkt. No. 55-12 at 4–5; Dkt. No.

7  87-1 at 7. Prior to that, Colestock avers he told her over the phone that she "would never be OIC

8  in Eastsound again" and should not "be supervising anyone." Dkt. No. 55-14 at 3.[13] According to

9  Colestock, Singh-Minhas also told the Snohomish postmaster about her pending investigation and

10  Senecal improperly copied one of her Snohomish colleagues on an email scheduling Colestock's

11  investigative interview. Dkt. No. 55-14 at 3–4. But just because Colestock casts these events as

12  contributing to the same hostile work environment as the one created by Cowen does not make it

13  so. *See Caldwell*, 2019 WL 1556246, at *11 (noting that severing the relationship between the

14  plaintiff and harasser can "break[] the chain necessary to link the otherwise untimely acts to those

15  that are timely").

16        In addition, Colestock presents only threadbare evidence in support of her contention that

17  Senecal and Singh-Minhas engaged in the above-described conduct because she was a woman. In

18  her cross-motion, for instance, Colestock asserts, without citation to the record, that Senecal

19  "reacted to Colestock[] in a decidedly negative manner," "chastised [her] and decided she was at

---

[13] On reply, USPS mentions in passing that "Colestock's statement attached to her EEO complaint is not a declaration under 28 U.S.C. § 1746 and is hearsay," and therefore the Court should decline to consider it. Dkt. No. 90 at 21 n.7 (citing Dkt. No. 55-14). Nevertheless, because USPS does not specify which portions of the statement are hearsay, aver that its contents could not be presented in an admissible form at trial, or move to strike it, the Court considers it while noting that it does not change the outcome here. *See, e.g.*, *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157–58 (S.D. Cal. 2022); Fed. R. Civ. P. 56(c)(2); *see also Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006) (describing the Ninth Circuit's "general principle whereby it treats the opposing party's papers more indulgently than the moving party's papers." (cleaned up)).

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT - 19

fault before he ever interviewed her," and that "[h]is actions, . . . repeatedly documented by Colestock, would be considered abusive to any reasonable wom[a]n." Dkt. No. 86 at 27. Such conclusory assertions, absent supporting evidence, are insufficient to survive summary judgment. *See Porter*, 419 F.3d at 893 (concluding that where nothing in the record suggested that plaintiff's timely allegations "were sexually charged, or . . . would not have been directed toward [plaintiff] if she was a man," and there was "no evidence linking these comments and contumelies to the actions of" prior harassers, such acts were "not connected to the same hostile-environment practice"); *see also Rhine v. Buttigieg*, No. 2:20-CV-01761-RAJ-BAT, 2022 WL 18673225, at *10 (W.D. Wash. Nov. 22, 2022), *report and recommendation adopted*, 2023 WL 1928089 (W.D. Wash. Feb. 10, 2023).

Moreover, the record evidence does not generate a material dispute as to whether the actions of Senecal and Singh-Minhas, standing by themselves, were sufficiently severe or pervasive to support a hostile work environment claim. *Porter*, 419 F.3d at 893; *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006). "Not every insult or harassing comment will constitute a hostile work environment." *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). "The required severity for harassing conduct varies inversely with the pervasiveness or frequency of the conduct," meaning that sporadic comments "have to be proportionately more severe to make up for their relative infrequency." *Fried*, 18 F.4th at 649 (quotation marks and citation omitted); *see id.* (surveying Ninth Circuit case law in which sexually or racially motivated derogatory language was found not severe enough to create a hostile work environment). "In addition, the working environment must both subjectively and objectively be perceived as abusive." *Vasquez*, 349 F.3d at 642 (cleaned up). "Thus, a plaintiff must show that they perceived the work environment to be hostile and that a reasonable person in their position would also

1    perceive it as such." *Edgell v. Regan*, No. 2:22-cv-00045-JHC, 2023 WL 8702058, at *16 (W.D.

2    Wash. Dec. 15, 2023).

3        In some cases, an employer's response to sexual harassment allegations is the "proper focus

4    for the hostile work environment claim[.]" *Fried*, 18 F.4th at 650–51 (first citing *Brooks v. City of*

5    *San Mateo*, 229 F.3d 917, 921–26 (9th Cir. 2000); then citing *Little*, 301 F.3d at 964–67); *see also*

6    *id.* at 647; *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1162 (9th Cir. 2017). But Colestock fails

7    to produce evidence suggesting that Senecal's sparse comments, questions, and scheduling email,

8    in conjunction with Singh-Minhas's isolated conduct, were sufficiently severe and pervasive to

9    create an objectively hostile work environment that altered the conditions of her employment. For

10   instance, unlike the supervisors in *Fuller*—a case upon which Colestock relies—the record in this

11   case does not reflect anything remotely akin to USPS management's "public and internal

12   endorsements" of Cowen following Colestock's complaints. 865 F.3d at 1162–63.

13       The Court's conclusion by no means condones Cowen's conduct. "Quite the opposite: The

14   conduct of which [Colestock] complains was highly reprehensible." *Brooks*, 229 F.3d at 927. As

15   the Ninth Circuit observed in *Porter*, "few types of harassing conduct are more extreme than

16   thrusting explicit sexual propositions toward an employee and then executing reprisals against her

17   for resisting the advances." 419 F.3d at 892. Yet the egregiousness of such conduct does not

18   automatically allow the Court to "conclude that all the offensive activities that [Colestock]

19   allegedly encountered [prior to the limitations period] are both timely and actionable as different

20   parts of the same unlawful employment practice." *Id.* (cleaned up). Accordingly, because

21   Colestock's hostile work environment claim based on Cowen's conduct is untimely, the Court

22   grants USPS's motion for summary judgment on this claim.[14]

23

24   _____

[14] Because the Court grants USPS's motion and finds Colestock's hostile work environment claim procedurally barred, the Court denies Colestock's cross-motion, Dkt. No. 86.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT - 21

      b.     *Even if Colestock's Hostile Work Environment Claim Were Timely, She Fails to Establish a Dispute of Material Fact as to USPS's Reasonable Care Defense*

An employer is vicariously liable for the actions of a "supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).[15] However, where, as here, "no tangible employment action is taken" by the supervisor, a defending employer may raise the affirmative defense of "reasonable care." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *accord Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011). Under this defense, an employer can avoid liability by establishing by a preponderance of the evidence that (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (citation omitted); *accord Faragher*, 524 U.S. at 805; *Ellerth*, 524 U.S. at 765.

USPS argues that it is entitled to summary judgment on its reasonable care defense because (1) it maintained an adequate anti-harassment policy which Colestock was aware of but failed to take advantage of, and (2) it took prompt action to correct the allegedly harassing behavior after being made aware of Colestock's allegations. Dkt. No. 54 at 15–17; Dkt. No. 90 at 15–19; *see* Dkt. No. 55-17 (USPS's "Employee's Guide to Understanding, Preventing, and Reporting Harassment"). Colestock does not dispute that USPS had adequate anti-harassment policies in place that she knew about, or that the OIG began its investigation promptly, but instead contends that USPS conducted a flawed investigation, failed to prevent Cowen from creating a hostile work

---

[15] The parties appear to agree that Cowen acted as Colestock's supervisor for purposes of vicarious liability. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT - 22

environment in the first place, and inadequately disciplined Cowen. Dkt. No. 86 at 30–35; Dkt. No. 92 at 12–13.[16] For instance, Colestock argues that USPS should have known about Cowen's inappropriate conduct before she complained about it:

> Had USPS at a minimum exercised some control over his cell phone, including auditing its use or checking on the pictures and texts he sent, it could have stopped the sexual harassment and ended this hostile work environment. Instead, they never looked and never so much as sent anyone to visit Eastsound where they would have found an unlicensed Cowen driving postal vehicles, drinking at the post office, abusing his role, paying a subordinate to [do] his job for him, and sexually harassing any female who came near him.

Dkt. No. 86 at 32. Colestock does not adduce evidence, though, tending to show why it would have been reasonable for USPS to monitor Cowen's phone for sexually harassing materials or otherwise investigate him absent any complaint or indication that Cowen was engaging in sexual misconduct. *See, e.g.*, *Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003) ("The legal standard for evaluating an employer's efforts to prevent and correct harassment . . . is not whether any additional steps or measures would have been reasonable if employed, but whether the employer's actions as a whole established a reasonable mechanism for prevention and correction."). Although Colestock found out during discovery that Cowen had previously engaged in sexual relationships with other USPS employees, it is undisputed that no complaints had previously been filed against Cowen, and that the only workplace relationship of Cowen's of which USPS was aware prior to this litigation was a report from a former superior of Cowen's that she planned to ask him out on a date. Dkt. No. 55-19 at 5; Dkt. No. 91-2 at 7; Dkt. No. 87-12 at 35–36.

---

[16] Colestock confusingly asserts that USPS "ignored what happened after Colestock reported Cowen's conduct," which is not supported by the record. Dkt. No. 86 at 30. Colestock also states that "Defendant's 'investigation' was not prompt" because "Colestock reported Cowen's misconduct on May 19, 2021, and Senecal did not take any action until June 16, 2021." *Id.* at 35. But such argument conflates the promptness of the investigation and the timing of the resulting discipline.

Colestock also takes issue with the fact that the OIG (and not USPS) investigated Cowen, and faults USPS for not investigating Cowen following his retirement. Dkt. No. 86 at 33–34. However, she does not dispute that the OIG initiated its investigation into Cowen's conduct five days after she disclosed it to Ching, that she and Cowen never worked together again following her conversation with Ching, or that USPS placed Cowen on unpaid leave the same day he corroborated her statements in his interview with the OIG. Nor does she argue that Cowen's retirement did not prevent any continuing sexually harassing behavior.

Colestock further argues that Senecal's subsequent investigation into her own misconduct undermines USPS's reasonable care defense with respect to Cowen's harassment. *Id.* at 34–35. But Colestock does not show how her challenges to Senecal's investigation of her actions bear upon the reasonableness of the agency's remedial action vis-à-vis Cowen, who at that point was no longer employed by USPS. *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (employers are obligated to undertake remedial measures reasonably calculated to end the harassment).

Because Colestock has failed to raise a genuine dispute of fact as to the reasonableness of USPS's care to prevent and correct promptly Cowen's behavior, the Court finds that USPS has satisfied the first prong of its reasonable care defense. *See Holly D.*, 339 F.3d at 1178 ("Even were we to assume that all of these additional steps were advisable, [defendant]'s failure to pursue all possible leads does not undermine the substantial showing in this case that its investigation was, in toto, both prompt and reasonable."); *see also Craig*, 496 F.3d at 1057.

The second prong of USPS's reasonable care defense requires a showing that Colestock "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Montero v. AGCO Corp.*, 192 F.3d 856, 863 (9th Cir. 1999) (quoting *Faragher*, 524 U.S. at 807). The record reflects that Colestock waited approximately 14 months to report Cowen's harassment, including for roughly six months after

1    she moved to the Snohomish office. Colestock does not argue that she was unaware of USPS's

2    policy on harassment or how to report Cowen's conduct. *See* Dkt. No. 87-5 at 7; *see also* Dkt. No.

3    55-21 at 9. Indeed, she filed an EEO complaint about a hostile work environment in 2018. Dkt.

4    No. 55-15; *see also* Dkt. No. 55-17 at 12. Rather, she argues that she did not report Cowen sooner

5    out of concern for the negative consequences she would face for doing so (both from Cowen and

6    USPS management). Dkt. No. 86 at 32–33.

7    The law "is intended to encourage employers to provide, and employees to use, remedies

8    within the workplace, so an employee may not unreasonably fail to use those remedies." *Tofsrud*

9    *v. Potter*, 490 F. App'x 857, 859 (9th Cir. 2012). Here, the Court finds that "[e]ven if [Colestock]'s

10   hesitation to engage the employee relations department were reasonable . . . she has offered no

11   evidence to explain why she did not seek help through any of the other sources affiliated with

12   [USPS]." *Holly D.*, 339 F.3d at 1178; *see also Tofsrud*, 490 F. App'x at 859 (finding that the

13   plaintiff "acted unreasonably in not taking advantage of the employer's preventive and remedial

14   mechanism" where plaintiff "had previously gone over her supervisor's head to a higher manager

15   in order to report a workplace grievance"); *Montero*, 192 F.3d at 863–64 (plaintiff "unreasonably

16   failed to take advantage of the company's preventive and corrective opportunities earlier, although

17   she knew of their existence," when she waited "almost two years" to report). For example,

18   Colestock could have reported the misconduct to a union representative. Dkt. No. 55-17 at 18.

19   Accordingly, USPS has met its burden to show, as a matter of law, that it exercised

20   reasonable care to prevent and promptly correct Cowen's unwelcome sex-based conduct, and that

21   Colestock unreasonably failed to take advantage of remedial opportunities. Therefore, the Court

22   finds in the alternative that even if Colestock's hostile work environment claim was timely, USPS

23   is entitled to summary judgment on its affirmative defense of reasonable care.

24

2.    <u>Disparate Treatment and Wrongful Termination</u>

Turning to Colestock's remaining claims, USPS contends that Colestock's disparate treatment and wrongful termination claims based on her firing "are the same" under Title VII, which Colestock does not contest. Dkt. No. 54 at 17–18; *see* Dkt. No. 86 at 37–39. Given that both parties address these claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Court analyzes them together, *see, e.g.*, *Habib v. Tote Servs.*, No. C14-1685-RSL, 2017 WL 108553, at *6 (W.D. Wash. Jan. 11, 2017), *aff'd*, 699 F. App'x 759 (9th Cir. 2017).

For Colestock to prevail on her discrimination claim under Title VII, she may establish a prima facie case by demonstrating that: (1) she was qualified for her position and/or performed her job satisfactorily; (2) she was subjected to an adverse employment action; and (3) similarly situated men were treated more favorably or her position was filled by a man. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002); *Tungjunyatham v. Johanns*, 500 F. App'x 686, 689 (9th Cir. 2012); *see also Crowe v. Wormuth*, 74 F.4th 1011, 1035–36 (9th Cir. 2023); *Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1381 (W.D. Wash. 2019). Alternatively, she may "offer direct or circumstantial evidence of discriminatory motive to establish her prima facie case." *Opara v. Yellen*, 57 F.4th 709, 722 (9th Cir. 2023). Once a plaintiff establishes a prima facie case of discrimination under Title VII, the burden of production shifts to the defendant "to articulate a legitimate non-discriminatory reason for its adverse employment action." *Vasquez*, 349 F.3d at 640; *see also Opara*, 57 F.4th at 723 (explaining that the burden on the employer "is one of production, not persuasion and involves no credibility assessment" (cleaned up)).

If the defendant does so, the burden shifts back to the plaintiff to demonstrate "that the employer's articulated reason is pretextual." *Opara*, 57 F.4th at 723. Plaintiffs can "show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason

1    more likely motivated the employer or indirectly by showing that the employer's proffered

2    explanation is unworthy of credence.'" *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th

3    Cir. 2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). When a

4    plaintiff relies on circumstantial evidence to show pretext, she must "put forward specific and

5    substantial evidence challenging the credibility of the employer's motives." *Mayes v. WinCo*

6    *Holdings, Inc.*, 846 F.3d 1274, 1282 (9th Cir. 2017) (quoting *Vasquez*, 349 F.3d 642); *see also*

7    *Hittle v. City of Stockton, California*, 101 F.4th 1000, 1016 (9th Cir. 2024), *cert. denied,* 145 S.

8    Ct. 759 (2025). However, the "specific and substantial standard is tempered by [the Ninth

9    Circuit's] observation that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous

10   one." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (cleaned up).

11          USPS contends that Colestock fails to establish her prima facie case because she does not

12   present evidence of direct discrimination or that male comparators were treated more favorably

13   than her, and that even if she has, USPS had legitimate, non-discriminatory reasons for her

14   termination and Colestock cannot show evidence of pretext. Dkt. No. 54 at 18–23; Dkt. No. 90 at

15   19–22. Colestock argues that she has "identified numerous peers," both male and female, "who

16   were treated more favorably," Dkt. No. 86 at 37, and that "any reasonable jury could conclude that

17   Senecal possessed sexist stereotypes which motivated his decision to terminate Colestock," *id.* at

18   40.[17]

19          As far as Colestock's prima facie case under *McDonnell Douglas*, the record reflects that

20   she was qualified for her position, faced no previous discipline, and suffered an adverse

21   employment action when USPS fired her. For comparators, she names Ike White and Chris

22   Kaufman as similarly situated men treated more favorably than her. *Id.* at 37–38; Dkt. No. 1 at 6,

23

24   _____

[17] The Court notes that Singh-Minhas served as the concurring official on Colestock's notice of removal. Dkt. No. 55-13 at 7; *see also* Dkt. No. 87-6 at 3; Dkt. No. 87-8 at 4.

14. However, Colestock presents no evidence that they were treated better for the same or similar conduct, including engaging in sex acts inside the post office or receiving improperly elevated pay rates for months at a time. *See Ingram v. Pac. Gas & Elec. Co.*, 690 F. App'x 527, 530 (9th Cir. 2017) (explaining that the plaintiff and comparators do not display similar conduct if they were not involved in the same combination of offenses). Nor does she show that Cowen, who is arguably her only other comparator, was treated more favorably. Like Colestock, Cowen was investigated and his employment with USPS ended as a result. Indeed, USPS immediately suspended him, and when he quit while he was being investigated, USPS took actions to ensure he could not return. Dkt. No. 55-22 at 5–6; Dkt. No. 55-19 at 8–9; Dkt. Nos. 55-5, 55-7.[18]

Even if Colestock had established a prima facie case, she does not dispute that USPS produced legitimate, non-discriminatory reasons for terminating her employment, such as her consumption of alcohol at the Eastsound Post Office and improperly being paid at the postmaster level in violation of USPS policy. Dkt. No. 55-13 at 2. Thus, the burden would shift to Colestock to show pretext. But the record does not reflect direct or specific and substantial circumstantial evidence of discrimination sufficient to generate a genuine dispute concerning pretext. Instead, Colestock rests almost entirely on conclusory allegations. Dkt. No. 86 at 37–42; *see Opara*, 57 F.4th at 728–29 ("[M]ere conclusory allegations . . . are insufficient to raise a genuine issue of fact regarding an employer's motive[.]" (cleaned up)). For instance, Colestock repeatedly claims that Senecal predetermined the outcome of his investigation into her conduct following the OIG report. *See* Dkt. No. 86 at 39 ("Senecal . . . came into his interview with Colestock with a

---

[18] Colestock notes that a woman replaced her as OIC at the Eastsound Post Office. Dkt. No. 1 at 13–14. Colestock also identifies a woman she worked with at Eastsound as her comparator; to the extent Colestock claims this woman also took improper high pay, drank alcohol, and had sex on the job, that is not evidence that a similarly situated person *outside* her protected class received better treatment. *Carter v. Coquille Sch. Dist. #8*, No. 6:20-CV-01012-AA, 2022 WL 16552343, at *6 n.1 (D. Or. Oct. 31, 2022) (finding that another woman "is not outside of Plaintiff's protected class and so cannot serve as a similarly situated comparator"). Nor does the allegedly more favorable treatment accorded to this woman raise an inference of sex discrimination against Colestock.

predetermination[.]"); *id.* at 40 ("Before he even completed his investigation, or even his interview

of Colestock, Senecal has already determined that she was at fault[.]"); *id.* at 41 ("Senecal made

the decision to terminate Colestock prior to August 16, 2021."); *id.* at 42 ("Senecal made his

decision before he even interviewed Colestock."). Yet she cites to no evidence in the record

supporting such an assertion. Moreover, the sparse evidence in the record regarding Senecal and

Singh-Minhas does not create an issue of fact for purposes of showing that their reasons for her

termination were pretext for sex discrimination. Colestock highlights (1) her recounting of the July

9, 2021 conversation with Senecal, and (2) the following exchange from her deposition regarding

that conversation and her August 5, 2021 investigative interview, in order to show that Senecal

discriminated against her on account of her sex:

> Q. What comments did Paul Senecal make that made you uncomfortable?
>
> A. He found it hard to believe that if I didn't enjoy it I would have put up with it for so long.
>
> Q. What did he actually say?
>
> A. I find it hard to believe that you allowed this to continue for, I believe it was 18 months or however long he said it was, if you didn't enjoy it. . . .
>
> Q. What was Mr. Senecal's demeanor in the investigative interview you had with him?
>
> A. Condescending and combative.
>
> Q. How so?
>
> A. The questions that he asked, the tone of his voice, the body language. . . .
>
> Q. And how did that [July 9] conversation go?
>
> A. I believe I wrote a statement about it. It, it was odd at best, he informed me that he did not feel I should be ever allowed to be OIC in Eastsound again, possibly not even having a job.

*See* Dkt. No. 86 at 39–40 (citing Dkt. No. 87-1 at 6–7; Dkt. No. 55-14 at 3).[19]

Direct evidence of discrimination "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). As discussed above with respect to Colestock's hostile work environment claim, Senecal's and Singh-Minhas's words and actions are not evidence of direct discrimination. Likewise, these statements and interactions fare no better as circumstantial evidence of pretext sufficient to withstand summary judgment. Circumstantial evidence is "evidence that requires an additional inferential step to demonstrate discrimination." *Id.* "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez*, 349 F.3d at 642. Based

---

[19] In the "factual background" section of Colestock's cross-motion, she relies on the first portion of the above testimony to assert the following:

> Senecal used the interview process and his powerful position to beat up on Colestock, all this during a time she continued to be employed by the post office. He took great exception to Colestock's explanation about consent and how she did not feel like she had a choice, particularly her failure to highlight the OIG report and point specifically to the language. In his myopic and sexist view, it did not matter that Colestock described not having a choice and that her future was in Cowen's hands. Because she had already used the word "consensual," that sealed the deal for Senecal. Colestock recalls him telling her in the interview that he found "it hard to believe that you allowed this to continue for, I believe it was 18 months or however long he said it was, if you didn't enjoy it."

Dkt. No. 86 at 14–15 (quoting Dkt. No. 87-1 at 6). Although the Court draws all inferences in Colestock's favor, the written account of the interview reflects none of this. *See, e.g.*, Dkt. No. 55-12 at 4–5 (Senecal asking, "Is it true the activities identified in the OIG ROI were consensual in nature?"; "Why did you let these activities go on for a 16 month period?"; "What exactly did [Cowen] say that would give you the belief that your life would be difficult?"); *see also generally* Dkt. No. 55-12. This is not the only instance in which Colestock appears to take liberties with the record. For example, Colestock cites Senecal's deposition for the proposition that Cowen was permitted to retire with "full benefits," but the cited content does not support that. Dkt. No. 86 at 16 (citing Dkt. No. 87-6 at 11); *compare also, e.g.*, Dkt. No. 86 at 4–11, *with record cited in* Dkt. No. 90 at 2–8. Notably, Colestock's briefing also includes large swaths of argument completely devoid of citations to the record. *See, e.g.*, Dkt. No. 86 at 23–36; Dkt. No. 92 at 5–7. The Court has carefully considered the record and the parties' briefing, but notes that it is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if he elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)); *see also Celotex*, 477 U.S. at 322. In fact, the Court *cannot* do so: "[u]nder the principle of party presentation, courts must presume that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Todd R.*, 825 F. App'x at 442 (quotation marks and citation omitted). This principle is especially forceful "in a case such as this, involving a specialized area of civil law and competent, highly experienced counsel on both sides." *Id.*

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT - 30

on the record before the Court, there is no genuine issue for trial regarding whether Senecal and Singh-Minhas were motivated by animus against women, as opposed to the undisputed evidence of Colestock's multiple violations of USPS policy. "And the facts that [Colestock] identifies as circumstantial evidence of discriminatory pretext are neither specific nor substantial enough to support a finding of unlawful employment discrimination." *Hittle v. City of Stockton, Calif.*, 101 F.4th at 1017.

In addition, although Colestock challenges USPS's decision to terminate her employment on the basis of her relationship with Cowen, the record reflects that she admitted to the improper increased pay Senecal and Singh-Minhas cited as one of several reasons for her termination. Dkt. No. 55-3 at 21, 23, 33; Dkt. No. 55-12 at 5. "Disputing only one of several well-supported, independently sufficient reasons for termination is generally not enough to defeat summary judgment." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 633 (9th Cir. 2014); *see also Cornwell*, 439 F.3d at 1028 n.6 (explaining that a plaintiff "may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action" or "create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted"). Moreover, Colestock provides no explanation why Senecal and Singh-Minhas could not rely on that admission or her admissions of other violations of USPS policy.

Accordingly, the Court concludes that Colestock has not raised a genuine issue of material fact regarding whether her termination constituted sex discrimination, and USPS is entitled to summary judgment on these claims.

3.    <u>Retaliation</u>

To establish a prima facie claim of retaliation under Title VII, a plaintiff must show that "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and

(3) there was a causal connection between the two." *Lui v. DeJoy*, 129 F.4th 770, 782 (9th Cir. 2025) (quoting *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)). It is not sufficient to show that the protected activities were a motivating factor in the employer's decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362–63 (2013). Once a plaintiff has made this threshold prima facie showing, the *McDonnell Douglas* burden shifting test applies, and the defendant must articulate a legitimate, non-retaliatory reason for the challenged action. *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 693 (9th Cir. 2017). If the defendant does so, the plaintiff "has the ultimate burden of showing that [the defendant's] proffered reasons are pretextual." *Id.* (citation omitted).

The first and second elements of Colestock's prima facie case are not in dispute. Colestock's EEO complaint constitutes protected activity, and her termination qualifies as an adverse employment action. *See Poland*, 494 F.3d at 1180. The third element is therefore dispositive. USPS argues that Colestock has failed to establish a causal link between her protected activity and her subsequent termination, both as part of her prima facie showing and as pretext. Dkt. No. 54 at 24–26; Dkt. No. 90 at 25–27. Citing to the same evidence discussed above in relation to Colestock's discrimination claims, Colestock argues that "there is substantial evidence showing that Senecal and Minhas terminated Colestock's employment because she was a woman who opposed Cowen's sexual harassment and discrimination in the workplace." Dkt. No. 86 at 39. In addition, Colestock maintains that temporal proximity supports her retaliation claim: USPS issued her August 16, 2021 notice of removal weeks after she spoke to Ching, participated in the OIG's and USPS's investigations, and filed her EEO complaint. *Id.* at 40–41; *see* Dkt. Nos. 55-13, 55-16. The Ninth Circuit has held that "[t]emporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003); *see also Villiarimo*,

281 F.3d at 1065. Even assuming that the temporal proximity here establishes retaliation for purposes of Colestock's prima facie claim, though, she still fails to demonstrate a dispute of fact regarding pretext.

As with Colestock's disparate treatment and wrongful termination claims, USPS has articulated a nonretaliatory reason for terminating her employment. *See* Dkt. No. 55-3 at 21, 23, 33; Dkt. No. 55-12 at 5; Dkt. No. 55-13 at 2. Thus, the burden again shifts to Colestock to show that USPS's reasons were pretext for retaliatory animus. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). To do so, Colestock must demonstrate a genuine dispute that USPS's "neutral justifications for its actions were pretextual," either by directly "persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1022 (9th Cir. 2018) (cleaned up). Here, Colestock points to no direct or circumstantial evidence of pretext sufficient to preclude summary judgment.

Instead, Colestock cites to the following circumstantial evidence: the timing of her termination, her deposition testimony regarding her two interactions with Senecal, and her contention that other employees were not similarly disciplined. Dkt. No. 86 at 38–42. Viewing this limited evidence in the light most favorable to Colestock, the Court finds that the inferential leaps necessary to generate a dispute of fact regarding retaliatory animus on the part of Senecal and Singh-Minhas are simply too great. As discussed above, while the sequence of events leading to Colestock's termination may be sufficient to establish prima facie but-for causation, they do not, without more, show a degree of pretext necessary to withstand summary judgment.

Engaging in a protected activity does not grant an employee a free pass for their misconduct or insulate them from discipline, even when there is close temporal proximity between the protected activity and adverse employment action. *Buhl v. Abbott Labs.*, 817 F. App'x 408, 411

(9th Cir. 2020); *see also Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985) ("An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals."); *Rhine*, 2022 WL 18673225, at *12 (finding no pretext where "[defendant] had legitimate reasons to investigate [plaintiff] and that investigation found [plaintiff] violated legitimate company rules," and the plaintiff "admitted to violating those rules" contemporaneous with the notice of proposed removal). So too here. Colestock fails to explain how Senecal's statements give rise to a reasonable inference of retaliatory animus. And with respect to other employees not being disciplined, Colestock does not show that other employees "had similarly engaged in protected activity under Title VII," or that other "employees were let off the hook when similar allegations had been raised[.]" *Campbell*, 892 F.3d at 1023. The only other employee who admitted to similar allegations was Cowen, and he was investigated and his employment with USPS promptly ended.

Thus, Colestock has failed to raise a triable issue regarding her retaliation claim, and the Court grants USPS's motion for summary judgment on this claim.

### III.    CONCLUSION

For the foregoing reasons, the Court GRANTS USPS's motion for summary judgment, Dkt. No. 54, DENIES Colestock's cross-motion for summary judgment, Dkt. No. 86, and STRIKES Docket Number 88-1.

Dated this 16th day of April, 2025.

Lauren King
United States District Judge